

See also 77 F.Supp. 170.

Clark M. Robertson and Howard R. Johnson, both of Milwaukee, Wis., for plaintiff.

Timothy T. Cronin, U. S. Atty., of Milwaukee, Wis., and William B. Waldo, Asst. to Atty. Gen., for defendant.

DUFFY, District Judge.

Anne Hamilton McIntosh died testate on February 13, 1941. She was the widow of C. J. McIntosh who died on July 22, 1937. The plaintiffs are the executors under her will. On December 2, 1941, upon behalf of the estate, the executors filed a federal estate tax return showing a tax

**VAN DYKE et al. v. KUHL, Collector of Internal Revenue.**

**Civil Action No. 1630.**

District Court, E. D. Wisconsin.

Sept. 5, 1945.

due of $120,326.42, which was paid. A deficiency tax of $49,085.57 was assessed, which with $3,452.09 interest was paid. The increased tax resulted from the action of the Treasury Department in increasing the value of a downtown piece of real estate, located on Wisconsin Avenue in Milwaukee, from $428,571, to $600,000, and by disallowing a deduction claimed in respect to property previously taxed in the amount of $33,780.10. A claim for refunds was timely filed and was disallowed.

The property on which the Treasury Department increased the valuation is "L" shaped, having a frontage of 50 ft. on West Wisconsin Avenue and a depth of 150 ft. from that street, and having a frontage on North Second Street also of 50 ft. and a depth of 100 ft. from that street. Thereon two connected buildings are erected, the Wisconsin Avenue Building being of fairly new construction and two stories in height, and the Second Street Building being a remodeled theater which is three stories in height. The basements under both buildings have a ceiling height of 8 ft. or 9 ft. The premises contain merchandising space of approximately 12,000 sq. ft. S. S. Kresge Company is the lessee under a 99-year lease which will expire in the year 2011 and which provides for a new annual rental of $30,000.

The Probate Court of Milwaukee County appointed Howard J. Tobin and C. A. Rossbach as appraisers, and the value they fixed on the property in question was accepted and used by the Wisconsin inheritance tax authorities. The executors used the same valuation in the federal estate tax return.

Since 1934 Mr. Tobin has resided in Milwaukee and has been the manager of city loans for the Northwestern Mutual Life Insurance Company. His work involves the management of city real estate which the company has acquired through foreclosure and also the supervision of a loan account of approximately $130,000,000 on commercial properties, stores, and office buildings. Prior to 1934 he was employed by Montgomery Ward and Company and was in charge of their eastern division for the negotiation of leases, the purchase of real estate, and surveys for the location of retail stores. Mr. Tobin has heretofore appeared as a valuation witness in this court; he appraised the property of the Plankinton Building Company which is located on the same side of Wisconsin Avenue within a city block of the premises in question.

It was Mr. Tobin's opinion that, without considering the lease, the fair market value of the property at the date of Mrs. McIntosh's death was $410,000. However, with the lease in mind, he did not give consideration to the financial responsibility of the Kresge company by reason of Articles IX and X therein, which will be hereinafter referred to in more detail. Mr. Tobin further testified on this trial that the present rental runs 20% to 30% of Kresge's gross sales and that, therefore, the present buildings are not an adequate improvement for the land, as rentals should not exceed 6% of the gross sales. He also testified that in 1940 he made a study of the business districts of Milwaukee, which showed decreasing values of land in Milwaukee's central business district.

Mr. C. A. Rossbach, the other appraiser, also was a witness. He has been engaged in the real estate and appraisal business in Milwaukee since 1919. His testimony largely substantiated that of Mr. Tobin. However, under all the conditions present, and considering Articles IX and X of the lease, he felt that a capitalization rate of 7% was proper, and this gave him an appraised value of $428,571.

Mr. Harrison Saudek, a witness for the defendant, is a man of wide appraisal experience. Capitalizing at the rate of 5% he arrived at a figure of $580,740, which, together with a reversionary interest at $10,523, caused him to conclude that the fair market value as of February 13, 1941, was $590,000. Mr. Saudek considered the financial responsibility of the Kresge company and assumed that the rental obligation was a continuing liability of that company on the basis that the provisions of the lease did not afford any escape from that obligation. He did testify, "If John Smith was there and his credit wasn't as good as Kresge, I would not capitalize that

lease at 5%; I would capitalize it at 7%, possibly, and maybe 8%."

Mr. Robert Marty, another witness with appraisal experience, also reached the conclusion that $590,000 was a fair value. He also used a 5% capitalization and considered as fixed the continuing liability of the S. S. Kresge Company over the seventy years remaining in the lease. He also testified that he would use a higher capitalization rate if the Kresge company were not on the lease.

The relevant portion of Article IX follows:

"It is understood that the Lessee may assign or convey this lease or its every interest in and to said demised premises and improvements by any act or deed at any time, but such assignment or conveyance shall not be valid until and unless the assignee shall have accepted in writing the terms and conditions of this lease and such written assignment and acceptance shall have been recorded in Milwaukee County, Wisconsin, as provided by law for the recording of such instruments.

"If the Lessee shall make or attempt to make any assignment or conveyance of its leasehold interest, except as aforesaid, the acceptance by the Lessors of any rent from any person claiming as tenant or otherwise shall not be construed as a recognition of any such assignment or conveyance; it being expressly understood that the Lessors may at any time accept rent and money due upon this lease from any one offering to pay the same without thereby acknowledging the person so paying as a tenant in place of said Lessee, or recognizing any of the claims under which said person was offering to pay said rent or money.

"It is further understood and agreed that said Lessee may at any time mortgage its rights and interests under and by virtue of this lease in or to said demised premises and improvements, provided that no such mortgage or conveyance shall constitute or create any lien or incumbrance on the Lessors' title to the land hereby demised and to the buildings or improvements now or hereafter erected thereon.

"It is further agreed that the Lessee may sub-let said premises or any part thereof."

The paragraph of Article X referred to is:

"Provided always, So long as section 2197-A of Wisconsin Statutes of 1898 shall be and remain in force, the rights of the Lessors to re-enter as aforesaid or to recover possession of said demised premises after a new building has been erected on said premises shall be subordinate to and in accordance therewith."

Section 2197a of the Wisconsin Statutes has been renumbered and now appears as Sec. 234.19. Paragraph (1) of that section provides:

"Whenever there shall be any default in the conditions of any lease of lands or a breach of the covenants thereof and such lease shall provide for a term exceeding fifty years and require the lessee to erect or construct improvements or buildings upon the land demised at his own cost and exceeding in value the sum of five thousand dollars, and such improvements shall have been made, and the lessor desires to determine the lease and recover possession of the property described therein freed from all liens, claims or demands of such lessee, the lessor may, in case of any breach or default as aforesaid, institute an equitable action in the circuit court against the lessee and all persons claiming under him to recover the possession of the premises leased and proceed in all respects as if the action was brought under the statute to foreclose a mortgage upon real estate, except that no sale of the premises shall be ordered."

■ I do not believe that Article X in the lease should lessen the value of the property. Under its provisions the lessor has a choice whether to hold the lessee responsible in damages for breach of covenant, or to declare the lease at an end for breach of condition. Mohawk Co. v. Bankers Surety Co., 162 Wis. 272, 276, 156 N.W. 154; Elmor Realty Co. v. Community Theaters, Inc., 208 Wis. 76, 81, 241 N.W. 632. Even though the lessor must minimize his damages there would seem to be little likelihood of loss in holding Kresge

company for any difference in rents which might result.

However, the portions of Article IX heretofore quoted demonstrate that the lessee may assign the lease without the consent of the lessor upon the condition that the assignee accept the conditions of the lease and that the assignment and acceptance be recorded. Of course such lessee might have a less favorable financial standing than Kresge company.

Therefore, at least theoretically, if the lease proved very burdensome Kresge company might arrange for an assignee to take it over. Hence, defendant's witnesses were unwarranted in basing the valuation on the theory the lease contained no escape clause and that under all conditions Kresge company would be on the lease for seventy years. On the other hand, as a practical matter, in February, 1941, Kresge probably could not have found a better location in the city of Milwaukee for a downtown store. Also, just sixteen years before that, it had paid $400,000, for the privilege of assuming the burdens of the lease and, furthermore, have since leased an adjoining lot for a period expiring with the lease on the store property, so that even though improvements on the property are or might be inadequate Kresge company is apparently committed to a further investment of a downtown outlet at this location.

It is my opinion that the proper valuation lies between that arrived at by the appraisers who thought no possible escape clause was available to Kresge in the terms of the lease and those who regarded a possibility as a probability. Not at all in the spirit of a compromise, but by facing the situation which actually existed in February, 1941, I believe that a capitalization based upon a 6% rate would be just, and would result in a fair market value. A computation on that basis may be presented, and plaintiffs may have judgment accordingly.

The second portion of plaintiffs' claim is that they were denied the right to deduction on account of property previously taxed. Sec. 812 of the Internal Revenue Code provides:

"For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate—

\* \* \* \* \* \*

"(c) Property previously taxed. An amount equal to the value of any property (A) forming a part of the gross estate situated in the United States of any person who died within five years prior to the death of the decedent, or (B) transferred to the decedent by gift within five years prior to his death, where such property can be identified as having been received by the decedent from the donor by gift, or from such prior decedent by gift, bequest, devise, or inheritance, or which can be identified as having been acquired in exchange for property so received. This deduction shall be allowed only where a gift tax imposed under chapter 4, or an estate tax imposed under this subchapter, the Revenue Act of 1926, 44 Stat. 69, or any prior Act of Congress, was finally determined and paid by or on behalf of such donor, or the estate of such prior decedent, as the case may be, and only in the amount finally determined as the value of such property in determining the value of the gift, or the gross estate of such prior decedent, and only to the extent that the value of such property is included in the decedent's gross estate, and only if in determining the value of the net estate of the prior decedent no deduction was allowable under this paragraph in respect of the property or property given in exchange therefor." 26 U.S.C.A. Int.Rev. Code, § 812.

Mrs. McIntosh died within five years of the date of the death of her husband, C. J. McIntosh.

In their federal estate tax return plaintiffs made a claim, as a deduction for property previously taxed, in the sum of $33,780.10. This consisted of St. Benedict bonds valued at $9,713.34, Metropolitan bonds valued at $6,049.67, Toledo Edison bonds valued at $5,420.42, and $12,596.67 cash. Plaintiffs contend the bonds were purchased from proceeds of insurance re-

ceived by Mrs. McIntosh from the estate of her husband and upon which a federal estate tax had been paid, and that the cash was received from the same source.

Shortly after the death of C. J. McIntosh, his widow executed a general power of attorney to Messrs. Van Dyke, Robertson and Mixter. These attorneys continued Mrs. McIntosh's bank account in the Marine National Bank and made all deposits in that account. The evidence showed that Mrs. McIntosh had no other bank account. The income and disbursements of Mrs. McIntosh, as well as the proceeds from the estate of C. J. McIntosh, were commingled in the same account.

Plaintiffs prepared a schedule, Exhibit E, made up by them from the record of deposits and withdrawals shown in Mrs. McIntosh's bank account. Column "A. H. McIntosh" in Exhibit E shows the balance in Mrs. McIntosh's account at the date of her husband's death, and also all monies received by her from sources other than the estate of C. J. McIntosh. Disbursements were always subtracted from the column "A. H. McIntosh" except when the balance therein was not sufficient, in which case the disbursements were listed in the other column entitled, "C. J. McIntosh Estate." On this basis, when the St. Benedict bonds were purchased on January 3, 1939, the Toledo Edison bonds on January 7, 1939, and the Metropolitan bonds on January 20, 1939, there was no balance in the A. H. McIntosh column and on the date of her death there was a balance of cash of $12,596.67 listed as received from C. J. McIntosh estate.

The original bank records from which Exhibit E was constructed do not show any allocation. In the stipulation at the pre-trial conference the government did not bind itself as to the allocations made in said exhibit. It was understood that it was prepared by the executors pursuant to their theory of the applicable law.

The government urges that the Rodenbough rule of apportionment be used. This rule is based upon United States v. Rodenbough, 15 AFTR 551 and Rodenbough v. United States, 25 F.2d 13. This rule holds the taxpayer to the lowest possible advantage. In effect, it assumes that all purchases of new securities were made from moneys not derived from old securities or other property previously taxed as long as there is sufficient miscellaneous moneys in the account to purchase the new securities. Here plaintiffs contend for a rule that it is exactly the opposite. Plaintiff's schedule, Exhibit E, presumes that every disbursement other than for new securities was made out of miscellaneous moneys in the fund and that such miscellaneous moneys were entirely exhausted when the securities in question were purchased.

While this court on this date in an opinion handed down in Horlick v. Kuhl, 62 F.Supp. 168, disapproved the Rodenbough rule where all the facts and circumstances clearly indicated an intent by the second decedent to purchase the new securities from the proceeds of the old, in the case at bar there is an entire failure to show any such intent. That the attorneys in fact continued Mrs. McIntosh's bank account and did not set up a separate account is not persuasive of anything, and even granted that her representatives may be presumed to have been acting for the best interests of Mrs. McIntosh and her estate, that presumption does not prove the requisite intent, especially as one of them, Mr. Van Dyke, was a witness on the trial and no attempt was made to prove that Mrs. McIntosh's representatives had any such intent when the various disbursements were made. I conclude that the plaintiffs have failed to establish a right to a deduction under Sec. 812(c) of the Internal Revenue Code.

The attorneys for the plaintiffs will prepare findings of fact and conclusions of law to be settled on five days' notice.